UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
AIR CARGO NEWS, INC.,                       :
                                            :
                        Plaintiff,          :        **ORDER DENYING PLAINTIFF'S**
                                            :     **MOTION FOR A PRELIMINARY INJUNCTION**
            -against-                       :        07-CV-480 (DLI)(RLM)
                                            :
TABMAG PUBLISHING, LTD.,                     :
AIR CARGO MEDIA, LTD., and                   :
RAY CRANE,                                  :
                                            :
                        Defendants.         :
-------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

On February 2, 2007, plaintiff Air Cargo News, Inc., the publisher of "Air Cargo News," a newsletter for the air cargo industry, brought this action against Tabmag Publishing, Ltd., Air Cargo Media, Ltd. and Ray Crane (" Mr. Crane" or "defendants"), the publisher of "Aircargo News" and "Aircargo USA," competing publications, alleging trademark infringement and unfair competition, as well as dilution pursuant to 15 U.S.C. § 1125 ("Lanham Act") and N.Y. Gen. Bus. Law § 360.[1] Plaintiff argues that trademark protection is warranted because AIR CARGO NEWS, as a "composite mark," has acquired secondary meaning. Defendants contend that they are entitled to name their publications "Aircargo News" and "Aircargo USA" because AIR CARGO NEWS is a generic mark.

This matter is now before the court on plaintiff's application for an order pursuant to Fed. R. Civ. P. 65, enjoining defendants during the pendency of this action from using or applying to register AIR CARGO NEWS, or any word or combination of words which is similar to AIR

_____

[1]Plaintiff's publication contains a space between the words "air" and "cargo," whereas defendants' publications combine the two words.

CARGO NEWS, and in particular, AIR CARGO USA, and the domain name http://www.aircargonews.net. Plaintiff's motion for a preliminary injunction is denied because the court finds that AIR CARGO NEWS is a generic mark.[2]

## Findings of Fact

Pursuant to Fed. R. Civ. P. 65(a), the court held a hearing on the preliminary injunction on March 6 and March 13, 2007. At the hearing, Geoffrey Arend, President, Editor and Publisher of "Air Cargo News," William Boesch, President and Chairman of the Board of Cargo Logistics Solutions, Vincent Chabrol, founder of World Trade Business USA, and Sabiha Arend, wife of Mr. Arend, testified on behalf of plaintiff. Ray Crane, Chief Executive Officer of both Tabmag Publishing, Ltd. and Air Cargo Media, Ltd., testified on behalf of defendants. With few exceptions, the court found Mr. Arend, Mrs. Arend, Mr. Chabrol and Mr. Crane to be credible witnesses. However, except to the extent indicated below, the court finds Mr. Boesch's testimony incredible as it revealed a strong bias toward the plaintiff and appeared to be the product of witness-coaching.

The following facts were adduced at the hearing: Plaintiff's publication, "Air Cargo News," which commenced operation in 1975, is a family-owned publication tailored to meet the needs of the air cargo and airline communities. (Tr. at 14.) The newsletter, measuring 10 ½ x 13 inches, contains the words "Air Cargo News" at the top of the first page in bold, capitalized black lettering with a space between each word. (Pl.'s Ex. 6; Defs.' Ex. A.) In or about January 1976, "Air Cargo News" was listed in the Standard Rate and Data Services ("SRDS"), and was classified under § 148,

---

[2]Plaintiff raised a claim against defendants for cyberpiracy under 15 U.S.C. § 1125(d) based on defendants' use of the domain name http://www.aircargonews.net. Plaintiff failed to address whether it may demonstrate a likelihood of success on the merits of this claim. Accordingly, the court will not address the claim at this time.

which includes transportation publications. (Tr. at 147; Arend Aff. Ex. C.) Since its inception, plaintiff has continuously published a newsletter nine times per year. (Tr. at 28.) Although the February/March 2007 issue is "on the press now," the last publication was in December 2006. (*Id*. at 143.)

During the years 1991-1994, plaintiff changed the title of its publication to "Air Cargo USA." (*Id*. at 183-86.) However, the words "Air Cargo News" appeared on the internal pages of the newsletter during that time. (*Id*.) Although plaintiff has not used the title "Air Cargo USA" on any publication since 1994, it still receives mail addressed to that name. (*Id*. at 186, Pl.'s Exs. 14-15, 17-19.)

The total circulation of "Air Cargo News" is 16,729, of which 15,246 copies circulate in each of the fifty states and the District of Columbia. (Tr. at 29; Pl.'s Ex. 4.) Of that number, 100 copies are paid subscriptions (Tr. at 194.) In addition to the 100 copies sold each year, plaintiff's total income of $250,000 comes from (1) airline advertisers, such as American Airlines, United Airlines, Virgin Atlantic, Emeritz, British Airways, Lufthansa, Singapore Airlines, Sky Cargo, (2) airports, such as Port Authority of New York and New Jersey, Miami Airport, Los Angeles Airport, Dubai Cargo Village, and (3) freight forwarders such as Purolater and Burlington Air Express. (*Id*. at 31, 134, 144.) Plaintiff has never prepared a consumer survey. (*Id*. at 197.)

Although plaintiff does not pay to advertise its publication in other publications or on television, the AIR CARGO NEWS mark has appeared at trade shows, on television, and in various media publications, both domestically and abroad. (*Id*. at 21, 25-26, 32-34, 132-33, 191-92; Arend Aff. ¶¶ 5-9.) In 1986, the Department of Transportation awarded Mr. Arend, in association with "Air Cargo News," its highest honor for his efforts to save the Marine Air Terminal at LaGuardia

Airport. (Tr. at 17-18; Arend Aff. ¶ 10.) Mr. Arend was also the recipient of the Kiwanis Club Award and the Bishop Wright Award. (Tr. at 18.) Mr. Arend has published thirteen books relating to the airline industry under the "Air Cargo News" name. (*Id*. at 23-24; Arend Aff. ¶ 5.) The court credits Mr. Boesch's testimony that, based on his forty years of experience in the air cargo industry, plaintiff's publication has an "excellent" reputation because it has "been around a long time" and "is very informative." (*Id*. at 114.)

In 2001, plaintiff began an ezine (electronic magazine) called the "Flying Typers," which displays the AIR CARGO NEWS mark. (*Id*. at 58; Arend Aff. ¶ 11.) Plaintiff also acquired the domain name http://www.aircargonews.com on May 7, 1997, on which it promotes and advertises its products. (Arend Aff. ¶ 12.)

In 1983, defendants commenced production of a monthly magazine devoted to the air cargo industry, called "Aircargo News." (*Id*. at 63.) The newsletter contains the word "aircargo" in bold red lettering with the word "news" below in similar-sized white lettering. There are no capital letters used in the title and no space appears between the words "air" and "cargo." (Arend Aff. ¶ G; Friendman Decl. Ex. A.) Mr. Crane testified that, prior to 1983, he had never seen or heard of plaintiff's publication, despite having worked in the air cargo industry since 1975. (Tr. at 63.) Prior to choosing "Aircargo News" as the title of his newsletter, Mr. Crane examined two magazine auditing bodies, Business Publications Audit ("BPA") in the United States and Audit Bureau of Circulations ("ABC") in the United Kingdom, which list the names and circulation numbers of all audited magazines. The audit bodies did not list any publication with the name "Air Cargo News." (*Id*. at 64.) Mr. Crane also checked trademark registrations in the United States and some European countries and found no registrations for "Air Cargo News." (*Id*.)

Mr. Crane testified that he first became aware of plaintiff's publication in 1983, six months after his newsletter went into production, when he saw Mr. Arend at a trade show in Europe. (*Id*. at 65.) After introducing himself to Mr. Arend at the trade show, Mr. Crane received a letter from an attorney one week later complaining about his use of the name "Aircargo News." (*Id*. at 65-66.) However, the court discredits Mr. Crane's testimony with respect to this incident because Mrs. Arend, whom the court found to be very credible, testified that Mr. Arend could not have been at a trade show in Europe in 1983 because he did not obtain a passport until 1989. (*Id*. at 151.) Rather, the court credits Mr. Arend's testimony that he became aware of defendants' "Aircargo News" in the late 1980's. (*Id*. at 39.) He would "occasionally . . . see a copy" of defendants' publication in the United States. (*Id*. at 46.) In 2003, Mr. Arend wrote in "Flying Typers," "We are not the U.K. bumps that misappropriated our name in 1983 and have been phonies since that time . . . We are the original, not the U.K. knockoff that filched our name in 1983 after we had been in business publishing since 1975." (*Id*. at 47-48.)

Defendants circulated about 1,000 copies of the "Aircargo News" publication during the 1980's in the United States. (*Id*. at 66-67.) Thereafter, circulation increased, and from 1997 to the present, approximately 2,800 copies circulate in the United States. (*Id*. at 67, 69-70; Defs.' Ex. B.) The gross income of defendants' publication is between $3,000,000 and $4,000,000 per year, and the vast majority is derived from advertising. (*Id*. at 75.) The International Air Cargo Association has given defendants' publication an award for excellence on three separate occasions. (*Id*. at 76.) Mr. Crane personally received the McClain Hunter's Publisher of the Year Award, and the editor of defendants' publication has appeared on television and the radio. (*Id*.)

Approximately eight years ago, Mr. Crane began an electronic publication and tried to

register "aircargo news" as an internet domain name for his company. (*Id*. at 72.) However, two registrations already existed with the name "air cargo" - "aircargonews.com" and "aircargonews.co.uk", both registered by A to Z Publications. (*Id*. at 73.) The two names had been dormant for some period of time. (*Id*.) In 2001, Mr. Crane registered "aircargonews.net" as a domain name, and brought a proceeding against A to Z before an arbitrator in Geneva under the auspices of the World Intellectual Property Organization ("WIPO") to have the domain name "aircargonews.com" transferred to them. (*Id*. at 73, 76.) The arbitrator ruled against Mr. Crane in 2002, but defendants continue to use the domain name "aircargonews.net" in connection with the sale, offering for sale, distribution, advertising, and promotion of their publication. (*Id*. at 74; Arend Aff. Ex. F.)

In late 2006, defendants began circulating a sample issue of a new publication, "Aircargo USA," to 30,000 people in the United States. (*Id*. at 77.) The newsletter, measuring 11 ½ x 15 ½ inches, contains the words "Aircargo USA" at the top of the first page in bold red and blue lettering with no space between the words "air" and "cargo." (Defs.' Ex. G.) Defendants plan to launch the "Aircargo USA" publication on April 9, 2007 on a bi-weekly basis with a circulation of 17,200 in the United States. (*Id*.)

When defendants' newsletter was initially published in 1983, Mrs. Arend received calls "about who we were and who the other publication was," but instances of advertisers' confusion were "minimal" between 1983 and the mid-2006. (*Id*. at 152.) However, there have been several instances of confusion on the part of advertisers since fall 2006. (Pl.'s Exs. 7-13.)

In addition to plaintiff's and defendants' publications, at least five other publications contain the words "air cargo" in the title, "Air Cargo Week," "Air Cargo World," "Air Cargo Update," "Air

Cargo Asia-Pacific," and "British Air Cargo." (Pl.'s Ex. 20; Defs.' Exs. C, D, E, F.) Both Mr. Arend and Mrs. Arend acknowledged that other newsletters with the words "air cargo" in the title circulate in the United States. (*Id*. at 40-41, 143.) Mr. Chabrol was aware of "Air Cargo Weekly" and "Air Cargo World." (*Id*. at 140.) Mr. Boesch was aware of "Air Cargo World" and "Air Cargo Guide," and testified that he subscribes to both plaintiff's and defendants' publication because he believes the "publications are different in their area of expertise and coverage." (*Id*. at 102, 108, 119.)

## Discussion

### I.      Preliminary Injunction Standard

To obtain a preliminary injunction, a party must demonstrate the probability of irreparable harm and either a likelihood of success on the merits or "a serious question going to the merits and a balance of hardships tipping decidedly in its favor." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). "In an action for trademark infringement, where a mark merits protection, a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." *Id.* at 46. Thus, plaintiff will be entitled to a preliminary injunction if it can show (1) that the AIR CARGO NEWS mark, as a whole, merits protection, and (2) that use of the mark by defendants will confuse consumers as to the source of the newsletter.

### A.      The Term AIR CARGO NEWS is Not a Legally Protectable Mark

Plaintiff's mark, AIR CARGO NEWS, is not federally registered and therefore not presumptively entitled to protection. *See* 15 U.S.C. § 1057(b); *see also Lois Sportswear, U.S.A. Inc.*

*v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). However, Section 43(a) of the Lanham Act,

15 U.S.C. § 1125(a), may "protect[ ] an unregistered trademark . . . against infringement." *Grupe*

*v. Linda Lori Sportswear, Inc.,* 921 F. Supp. 987, 994 (E.D.N.Y. 1996) (citing *Coach Leatherware*

*Co. v. Ann Taylor, Inc.,* 933 F.2d 162, 168 (2d Cir. 1991)). Thus, plaintiff will prevail on the merits

of its unregistered trademark infringement claim if it can show that "it has a valid [trade]mark

entitled to protection and that the defendant's use of it is likely to cause confusion." *Arrow Fastener*

*Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir. 1995) (citation and internal quotation marks

omitted).

Not all trademarks are entitled to the same degree of legal protection. The Second Circuit

has set forth four different classes of trademark protection: (1) generic; (2) descriptive; (3)

suggestive; and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d

4, 9 (2d Cir. 1976). The two classes implicated in the instant action are generic and descriptive.

A generic mark is one that involves a "common description of goods" or services, or refers

"to the genus of which the particular product is a species." *Genesee Brewing Co. v. Stroh Brewing*

*Co.,* 124 F.3d 137, 143 (2d Cir. 1997) (internal citations omitted). "Spoon," for example, as it refers

to a spoon, is a generic term because it identifies, rather than describes the article. *Abercrombie &*

*Fitch,* 537 F.2d at 10. Generic marks do not, under any circumstances, receive trademark protection.

*Id*. at 9. The reason for preluding appropriation of such common descriptive terms is clear: "to allow

trademark protection for generic terms, . . . even when these have become identified with a first user,

would grant the owner of the mark a monopoly, since a competitor could not describe his goods or

what they are." *CES Publ'g Corp. v. St. Regis Publ'n, Inc.,* 531 F.2d 11, 13 (2d Cir. 1975). Thus,

even when a generic term has developed a secondary meaning, it is unprotectable as a trademark.

*See id*.

"A descriptive mark is one that forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Bristol-Myers Squibb Co. v. McNeil - P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992). "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *Id*. (quoting *20ᵗʰ Century Wear Inc. v. Sanmark-Stardust, Inc.,* 747 F.2d 81, 88 (2d Cir. 1984), *cert. denied,* 470 U.S. 1052, 105 S. Ct. 1755, 84 L. Ed. 2d 818 (1985)). A descriptive mark is only entitled to protection "if it 'has become distinctive of the [producer's] goods in commerce.' This acquired distinctiveness is generally called 'secondary meaning.'" *Id*. at 1039 (quoting *Two Pesos Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)).

The test in determining whether a periodical title is a valid trademark is no different than that applied in determining whether any other mark is valid, and thus entitled to protection. *CES Publ'g,* 531 F.2d at 14. Periodicals differ from goods, however, in that their title is the primary means of conveying their content. As a result, many periodical titles walk the line between generic and descriptive marks. In recognition of this, courts have been reluctant to find the title of a periodical generic, "perhaps in part because the magazines in such cases were not literally the class title designated but were *about* that class." *Id*. (emphasis in original). For instance, in *American Ass'n for Advancement of Science v. Hearst Corp.,* the District Court for the District of Columbia held that the title "Science" for a magazine about science is not generic because there was no definite class of science magazines, and "Science" did not name either the plaintiff's product or a class of magazines. 498 F. Supp. 244, 255-56 (D.D.C. 1980); *see also H. Marvin Ginn Corp. V. Int'l Ass'n of Fire Chiefs, Inc.,* 782 F.2d 987, 991 (Fed. Cir. 1986) (finding the title "Fire Chief" to describe a

magazine devoted to fire fighting to be at most descriptive, rather than generic, because the term "Fire Chief" is neither the name of the fire-fighting industry nor about the fire-fighting industry.). Under Second Circuit law, however, titles consisting not only of an industry name, but of a class of periodicals devoted to advertising and discussing that particular industry, and an indication of the type of publication, are generic.

In *CES Publishing,* Judge Friendly, writing for the panel, held that "Consumer Electronics Monthly," as the title of a trade magazine, was not a protectable trademark as a matter of law because "consumer electronics" was a generic term describing consumer electronic products and is the name of a trade or industry. 531 F.2d at 14. Judge Friendly based his decision on the principle that "[w]here the title of a trade magazine names not only the class of goods but a class of magazines devoted to displaying and discussing those goods, that title is generic." *Id.* In distinguishing those decisions in which magazine titles were found descriptive, but not generic, Judge Friendly stated, "it is hard to think of a name for a magazine, directed deliberately and effectively to industry personnel, which more accurately names the class of trade magazines within that industry than one which simply gives itself the name of the trade plus the word 'Monthly'." *Id.* Similarly, in *Reese Publ'g Co. v. Hampton Int'l Comm., Inc.,* the Second Circuit, relying on *CES*, held that "Video Buyer's Guide" also names a "class of magazines devoted to displaying and discussing" the goods of a particular trade and is therefore generic. 620 F.2d 7, 11 (2d Cir. 1980). Finally, in *Abercrombie & Fitch*, the Second Circuit held that "Safariland Newsletter" is generic because it contains bulletins as to safari activity in Africa. *See also QRM Publ'g Co., Inc. v. Reed,* 230 U.S.P.Q. 217, 219 (S.D.N.Y. 1986) (finding "Real Estate Investing Letter" generic because it consists of an industry name and "an indication of a type of publication"); *Walker-Davis Publ'n v. Penton/IPC, Inc.,* 509

F. Supp. 430, 438 (E.D.Pa. 1981) (finding "Energy Management" generic because it "refers to the particular industry or field of interest to which defendant, and plaintiff, direct their magazines"); *Jenkins Publ'g Co. v. Metalworking Publ'g Co., Inc.,* 139 U.S.P.Q. 346, 348 (T.T.A.B. 1963) (finding "Metalworking" generic because the trade journal, which was distributed free to about 34,000 persons in various companies in the metalworking industries, was "devoted exclusively to advertisements and articles on metalworking equipment and supplies.").

Here, AIR CARGO NEWS refers to the air cargo industry, an industry devoted to shipping freight by air transportation. Plaintiff deliberately directs its newsletter to the air cargo industry and, with the exception of 100 paid subscriptions, distributes it free of charge to personnel within that industry. It is difficult to imagine a title that could more accurately describe that particular industry or the class of trade magazines devoted to the air cargo industry. Indeed, plaintiff is not the only publisher in this field to use the words "air cargo" in the title. There are at least five other publications whose titles contain the words "air cargo": "Air Cargo Week," "Air Cargo World," "Air Cargo Update," "Air Cargo Asia-Pacific," and "British Air Cargo." (Pl.'s Ex. 20; Defs.' Exs. C, D, E, F.) Thus, as was the case with "Consumer Electronics Monthly," "Video Buyer's Guide" and "Safariland Newsletter," "Air Cargo News" names a class of trade magazines, as well as a particular industry, by giving itself the name of the industry that is the exclusive subject of its advertisements and articles.

Furthermore, plaintiff's argument that the validity of its mark must be determined by looking at the mark as a whole, rather than by fragmenting "Air Cargo News" into its various components, "air cargo" and "news," is unavailing. While it is generally true that a trademark should be considered as a whole, *see Reese Publ'g Co.,* 620 F.2d at 11, the composite mark adopted by plaintiff

here is generic even when read as a whole.  Plaintiff does not argue that it uses typeface, color or other design elements to make its composite mark distinctive.  Moreover, "news" by its very name "connotes a publication relating information about people or happenings."  *Technical Publ'g Co., division of Dun-Donnelley Publ'g Corp. v. Lehbar-Friedman, Inc.,* 729 F.2d 1136, 1140 (7th Cir. 1984).  As such, "news" when coupled with the term "air cargo" indicates information about shipping freight by air transportation.  Plaintiff may not, therefore, prevent defendants from using this phrase simply because there are other titles defendants could use.  If the court were to forbid defendants from using the phrase "air cargo news" in their title, it would be difficult for them "to flourish and identify themselves to a relevant readership."  *CES Publ'g,* 531 F.2d at 14-15.

To the extent plaintiff asserts trademark rights in the title "Air Cargo USA," court finds that this mark has been abandoned.  The evidence demonstrates that plaintiff has not used that title on any publication in over thirteen years, since 1994.  A mark shall be deemed to be "abandoned" "[w]hen its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from the circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127.  Within the Second Circuit, two elements are necessary to find abandonment: (1) non-use; and (2) intent not to resume use.  *Stetson v. Howard D. Wolfe & Assoc.,* 955 F. 2d 847, 850 (2d Cir. 1992) (citing *Silverman v. CBS, Inc.,* 870 F.2d 40, 45 (2d Cir. 1989)).  Although evidence of an abandonment should be clear and convincing since it is in the nature of a forfeiture, *see Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir. 1980), the court finds Mrs. Arend's response, "[n]o, we have not," to the question, ". . . have you used the title Air Cargo USA on any publication since 1994," sufficient to prove non-use for more than three consecutive years.  (*Id.*)  Because the statutory presumption of abandonment has been established,

plaintiff has the burden of proving that circumstances do not justify the inference of an intent not to resume use. *See Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F. Supp. 2d 247, 268 (S.D.N.Y. 2002) (citing *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F.2d 96, 99 (5th Cir. 1983)). Plaintiff must present objective evidence of actual "concrete plans to resume use" in the "reasonably foreseeable future." *Silverman*, 870 F.2d at 46. "A bare assertion of possible future use is not enough" to prove an intent to resume use. *Id*. at 47. Given that Section 1127 defines "use" as "bona fide use of such mark made in the ordinary course of trade," merely producing mail received by plaintiff and addressed to "Air Cargo USA" does not satisfy plaintiff's burden of proving intent to resume use.

Based on the foregoing, the court concludes that AIR CARGO NEWS is generic and ineligible for trademark protection.

### B.      The Term AIR CARGO NEWS Has Not Acquired Secondary Meaning

Even assuming *arguendo* that plaintiff's composite mark is not generic, but merely descriptive, plaintiff has not proven that its mark has acquired secondary meaning.

"[T]he crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods." *Centaur Commc'n, Ltd. v. A/S/M Commc'n, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (citations omitted). Factors that are considered in determining whether a mark has developed secondary meaning include: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Genesee Brewing Co., Inc.,* 124 F.3d at 143 n. 4 (citation omitted).

1.    <u>Advertising Expenses</u>

Plaintiff contends that even though its advertising expenditures are nominal, it has invested in publicizing its connection to the AIR CARGO NEWS mark by other means. For instance, plaintiff attends numerous trade shows and pays its writers. In *Centaur Communications,* the Second Circuit found that the unregistered MARKETING WEEK mark was entitled to protection because it had acquired secondary meaning. 830 F.2d at 1222. In that case, although the advertising expenditures were relatively modest, $10,000 in direct mail solicitation, the fact that it had generated $250,000 in U.S. advertising revenue, sent brochures to the relevant consumer group (top American advertising agencies), sent its senior director from Europe to the United States to meet with advertising agencies, and sponsored conferences featuring speakers from U.S. advertising agencies under the "Marketing Week" banner, led the court to conclude that Centaur Communications had successfully associated itself with the MARKETING WEEK mark in the minds of the relevant consumer group. *Id.*

By contrast, plaintiff here has not introduced any evidence of advertising revenue, nor has it demonstrated how paying its writers or attending trade shows has been effective in causing the relevant consumer group, the air cargo industry, to associate itself with the AIR CARGO NEWS mark. The court recognizes, as did the Second Circuit in *Centaur Communications,* that "characteristics of the relevant market are important in considering advertising expenditures," and as such, has considered the small size and relative sophistication of members of the air cargo industry. 830 F.2d at 1222. However, the evidence of plaintiff's advertising efforts is insufficient to prove secondary meaning.

2.    Consumer Studies

This factor has no bearing on the present controversy since plaintiff has never prepared a consumer survey.  (Tr. at 197.)

3.    Sales Success

Plaintiff's total circulation of "Air Cargo News" is 16,729; however, only 100 copies out of that number are paid subscriptions.  (*Id*. at 194; Pl.'s Ex. 4.)  The paucity of subscribers, coupled with the fact that plaintiff only generates $250,000 gross income annually leads the court to find that plaintiff has only had minimal sales success.  By contrast, defendants' publication generates between $3,000,000 and $4,000,000 in revenue annually.  *Cf. Centaur Commc'n,* 830 F.2d at 1224 (finding the limited number of American subscriptions to "Marketing Week" to be "not dispositive" because "some of the subscriptions are held by large advertising agencies and companies where the magazine is read by more than one person . . . [and plaintiff] sold advertising to *Business Week,* the *New York Times*, Hilton International and McGraw Hill.").

4.    Unsolicited Media Coverage

AIR CARGO NEWS has received extensive media coverage within the air cargo industry, including numerous awards and appearances on television and in the news.  In 1986, Mr. Arend, in association with "Air Cargo News,"  received the highest honor awarded by the Department of Transportation for his efforts to save the Marine Air Terminal at La Guardia Airport.  (Tr. at 17-18; Arrend Aff. ¶ 10.)  In addition, he received the Kiwanis Club Award and the Bishop Wright Award, held roundtables attended by executives of major airlines, ran a cable television show, distributed industry achievement awards, and published thirteen books relating to the airline industry under the name, "Air Cargo News."  (*Id*. at 18, 23-24; Arend Aff. ¶ 15.)  Moreover, Mr. Boesch, an individual

15

with over forty years of experience in the air cargo industry, credibly testified that "Air Cargo News" has an "excellent" reputation. (*Id*. at 114.)

5. <u>Attempts to Plagiarize</u>

As evidence of defendants' bad faith and its intent to plagiarize the AIR CARGO NEWS mark, plaintiff argues that Mr. Crane knew of plaintiff's publication prior to 1983, and only decided to name his own publication "Aircargo News" after his failed attempt to purchase "Jet Cargo News" in 1982. With respect to "Jet Cargo News," Mr. Crane denied under oath that he ever made any effort to acquire "Jet Cargo News" prior to launching his "Aircargo News" publication. (Tr. at 79-80.) Mr. Crane further denied that he had ever seen or heard of plaintiff's publication prior to 1983. (*Id*. at 63-64.) However, the court questions the veracity of Mr. Crane's testimony that he was unaware of plaintiff's publication given that he had been working in the industry for eight years prior to 1983, during which time he had traveled to the United States and attended numerous trade shows. Additionally, Mr. Crane admits having attended a trade show in New York in 1982 where plaintiff had a booth under the banner of "Air Cargo News." (*Id*. at 79-80.)

Taken as a whole, however, the court finds the evidence of defendants' attempt to plagiarize plaintiff's mark to be inconclusive. Given the low number of copies of plaintiff's publication that circulated outside the United States, it is plausible that Mr. Crane may not have come across it prior to 1983. Moreover, the record is not clear with respect to the number of trips Mr. Crane made to the United States, or the number of trade shows he attended prior to 1983. Additionally, with respect to the 1982 trade show, it is possible that Mr. Crane did not see plaintiff's booth considering the vast number of vendors present at trade shows. Plaintiff concedes that Mr. Crane would not have discovered plaintiff's publication in either the BPA or ABC because it is not listed, nor would a

search of the trademark registrations have revealed plaintiff's publication because it remains unregistered to this day.

6.     Length and Exclusivity

Plaintiff argues that its thirty-two-year use of the AIR CARGO NEWS mark has been long and exclusive.  Plaintiff's argument fails because given the number of publications using the words "air cargo" in their titles that circulate in the United States, plaintiff's use of the phrase cannot be characterized as exclusive.  The court is aware of at least five other publications which contain the words "air cargo" in the title: "Air Cargo Week," "Air Cargo World," "Air Cargo Update," "Air Cargo Asia-Pacific," and "British Air Cargo."  (Pl.'s Ex. 20; Defs.' Exs. C, D, E, F.)  Although both Mr. Arend and Mrs. Arend acknowledged awareness of the other newsletters, they denied ever making any effort to protect their interest in the AIR CARGO NEWS mark by either registering the mark or instituting a lawsuit against any of the other publications.  (Tr. at 40-41, 143.)  Moreover, defendants have circulated between 1,000 and 3,000 copies of their publication in the United States since 1983 under a nearly identical title, "Aircargo News."  As such, the court finds that plaintiff has failed to protect its mark assiduously enough.[3]

**C.     Common Law Unfair Competition Claim**

"[T]he essence of unfair competition claims under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive

---

[3]Plaintiff cannot demonstrate a likelihood of success on the merits with respect to its dilution claims, pursuant to 15 U.S.C. § 1125(c) and N.Y. Gen. Bus. Law § 360(l), or its trademark infringement claim pursuant to N.Y. Gen. Bus. Law §§ 360(k), 360(l).  The AIR CARGO NEWS mark is not "famous" within the meaning of Section 1125(c)(2)(A), nor is it "distinctive" within the meaning of Section 360(l) because, as discussed above, plaintiff's advertising expenditures are minimal, the publication is only circulated within the air cargo industry, at least six other publications contain the words "air cargo" in their titles, and it is an unregistered mark.

purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir. 1995) (internal quotations and citations omitted). However, unlike unfair competition claims brought under Section 43(a) of the Lanham Act, claims brought under New York common law do not require proof of secondary meaning. *See Coach Leatherware,* 933 F.2d at 169 (citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950 (2d Cir. 1980), *cert. denied,* 459 U.S. 832, 103 S. Ct. 73, 74 L. Ed. 2d 71 (1982)). In determining likelihood of confusion, courts are guided by the now-familiar *Polaroid* factors set forth in *Polaroid Corp. v. Polaroid Electronics Corp.,* which include the: (1) strength of plaintiff's mark; (2) degree of similarity between the marks; (3) proximity of the products and services; (4) the likelihood that the prior owner will bridge the gap between the two markets by offering a product like defendants; (5) evidence of actual confusion; (6) whether defendant adopted its mark in good faith; (7) the quality of defendants' product; and (8) the sophistication of the buyers. 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied,* 368 U.S. 820, 82 S. Ct. 36, 7 L. Ed. 2d 25 (1961).

This is a close question, not only because plaintiff's and defendants' newsletters have nearly identical titles, but because both are directed at the airline and air cargo communities. However, as set forth above, the AIR CARGO NEWS mark is weak given plaintiff's minimal advertising expenditures and sales revenue, and that at least five other publications use the phrase "air cargo" in their titles. *See Citizens Fin. Group, Inc. v. Citizen's Nat'l Bank of Evans City,* 383 F.3d 110, 123 (3d Cir. 2004) ("as a general rule, widespread use of even a distinctive mark may weaken the mark."). In addition, Mrs. Arend's testimony that the instances of advertisers' confusion over the past twenty-four years have been "minimal"undercuts any finding of similarity between the marks. *See Affiliated Hosp. Prods. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975); *see also*

*Falcon Rice Mill v. Cmty. Rice Mill, Inc.,* 725 F.2d 336, 348 n. 13 (5th Cir. 1984 ) ("concurrent use of two marks over a substantial period of time without actual confusion strongly suggests that there is no likelihood of confusion."). Mr. Boesch's testimony that the two publications are "different in their area of expertise and coverage" further suggests that there is no likelihood of confusion. Moreover, the fact that defendants' publication has received an award for excellence on three separate occasions from the International Air Cargo Association and that Mr. Crane has personally received the McClain Hunter's Publisher of the Year Award, lead the court to believe that the quality of defendants' publication is high. Although Mrs. Arend testified that there have been several instances of confusion on the part of advertisers since fall 2006, the court finds the relevant consumer group of major airlines, freight forwarders and airports to be a relatively sophisticated group. Finally, as set forth above, the evidence regarding defendants' bad faith in adopting the AIR CARGO NEWS mark is inconclusive. Plaintiff has failed to establish either likelihood of confusion or defendants' bad faith. Accordingly, its state law unfair competition claim is rejected.

## II.   Doctrine of Laches

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank, N.A. and Citicorp, v. Citytrust and Citytrust Bankcorp, Inc.,* 756 F.2d 273, 275 (2d Cir. 1985) (internal quotations and citations omitted). "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and [as] such, . . . may justify denial of a preliminary injunction for trademark infringement." *Id*. at 276. To prevail on the affirmative defense of laches, a defendant must prove that (1) the plaintiff knew of

defendant's misconduct, (2) the plaintiff inexcusably delayed in taking action, and (3) the defendant was prejudiced by the delay. *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir. 1996). However, a plaintiff's lack of diligence standing alone may preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm. *Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 (2d Cir. 1985).

For equitable claims brought under the Lanham Act, where no limitations period is provided by the statute, courts look to the state statute of limitations to determine which party "possesses the burden of proving or rebutting the defense." *Conopco, Inc.,* 95 F.3d at 191. When a suit is brought prior to the running of that statute of limitations there is no presumption of laches, and the burden remains on the defendant to prove the defense. *Id.* However, once the statute of limitations has run, the burden shifts to the plaintiff to show why laches should not be applied. *Id.* Courts have consistently held that the six-year fraud statute, N.Y. C.P.L.R. 213(8), is the applicable statute of limitations for Lanham Act claims brought in New York. *Id.*; *see also Juicy Couture, Inc. v. L'Oreal USA, Inc. and Luxury Products, LLC,* No. 04 Civ. 7203, 2006 WL 1012939, at *33 (S.D.N.Y. Apr. 16, 2006.)

Here, the evidence shows that defendants have circulated between 1,000 and 3,000 copies of its publication in the United States since 1983, under a name nearly identical to that of plaintiff's publication. (Tr. at 66-70; Defs.' Ex. B.) The evidence also shows that plaintiff became aware of defendants' publication in the late 1980's. (*Id.* at 39, 46.) Indeed, Mrs. Arend testified that she received calls "about who we were and who the other publication was" when defendants' publication was initially published in 1983. (*Id.* at 152.) In 2003, Mr. Arend wrote in "Flying Typers," "We are not the U.K. bumps that misappropriated our name in 1983 and have been phonies since that time

. . . We are the original, not the U.K. knockoff that filched our name in 1983 after we had been in business publishing since 1975." (*Id*. at 47-48.) Plaintiff has failed to offer a tenable explanation as to why it made no objection, either formal or informal, as defendants systematically increased the number of copies of "Aircargo News" it circulated in the United States over the past twenty-four years. Moreover, defendants have established that they have been prejudiced by plaintiff's delay given their substantial commitment of resources to developing the original "Aircargo News" publication, as well as the new "Aircargo USA" publication. *Conopco, Inc.,* 95 F.3d at 192 ("prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.") (internal quotations and citations omitted).

Plaintiff does not, and cannot contest that it sat on its rights in the United States. Rather, plaintiff argues, pursuant to the doctrine of "progressive encroachment," that it timely and promptly brought suit as soon as defendants "c[ame] from the UK across the ocean into the United States 24 years later with a new infringing name . . . ." (Pl.'s Br. at 22, Mar. 23, 2007.) The doctrine of progressive encroachment allows a plaintiff some leeway in the timing of its suit, permitting it to wait until the "likelihood of confusion looms large." *Profitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.,* 314 F.3d 62, 70 (2d Cir. 2002) (quoting *Sarah Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462 (4th Cir. 1996)). "The primary rationale is that a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant." *Id*. Therefore, the court must question "whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff." *Id*.

Although Mrs. Arend testified that the instances of advertisers' confusion have increased since fall 2006, plaintiff cannot possibly claim that defendants have recently redirected their business to more squarely compete with plaintiff because defendants' publication has circulated within the United States for the past twenty-four years under a nearly identical name. (Pl.'s Exs. 7-13.) In addition to defendants' "Aircargo News" publication, at least five other publications containing the words "air cargo" in the title also circulate in the United States. Furthermore, the court fails to see how defendants new publication, "Aircargo USA," could increase the likelihood of public confusion of the marks given that the title, "Aircargo USA," is less similar to plaintiff's publication than defendants' original "Aircargo News" publication. The fact that plaintiff changed the title of its publication to "Air Cargo USA" from 1991-1994, but has not used that title on any publication since 1994, does not alter the analysis.

Accordingly, even if the court were to find that plaintiff's mark was entitled to legal protection, defendants' affirmative defense of laches would still bar plaintiff's claim for a preliminary injunction.

**Conclusion**

The court finds that the use of the AIR CARGO NEWS mark is ineligible for trademark protection, and thus, plaintiff cannot demonstrate either a likelihood of success on the merits or a sufficiently serious question going to the merits. Accordingly, plaintiff's motion for a preliminary injunction is denied. The court's order directing defendants to delay production of their "Aircargo USA" publication until April 11, 2007 is hereby vacated. (*See* Tr. at. 212.)

DATED:    Brooklyn, New York
           April 11, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge